UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS



| | |
|---|---|
| UTILITY WORKERS, LOCAL 369, | |
| Plaintiffs, | C.A. No. |
| v. | |
| EXELON NEW ENGLAND POWER SERVICES INC., | 04 cv 10293 DPW |
| Defendant. | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR TEMPORARY RESTRAINING ORDER**

I.  **INTRODUCTION**

This is an action to preserve arbitration and to preserve safety conditions in connection with mass reductions in staff. Plaintiff Local 369 requests that Defendant Exelon New England Power Services Inc. ("Exelon Service Company" or "Company") be enjoined from excessively reducing staffing levels. The staffing levels that will result from the company's action will violate the collective bargaining agreement and will create dangerous and unsafe working conditions. Implementation of the reductions in staff will also result in irreparable harm to the Plaintiff and its members. Local 369 requests equitable relief in aid of arbitration, prohibiting the excessive reductions in staff pending the completion of the contractual processes.

Plaintiff Utility Workers, Local 369 is a labor union and is the collective bargaining representative of seventy-seven of the Defendant's engineers, operators, mechanics, technicians, electricians, and clerical employees. Defendant Exelon Service Company is a Pennsylvania

1

corporation doing business as a power plant service company in Massachusetts. This action is brought pursuant to Section 301 of the Labor Management Relations Act, 29 U.S.C. §185, and injunctive relief is requested pursuant to Rule 65(a), Federal Rules of Civil Procedure. The Court has exclusive jurisdiction of this action pursuant to Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, without respect to the amount in controversy or the citizenship of the parties.

Plaintiff is before the Court on a Motion for Temporary Restraining Order, seeking an order requiring the Company to proceed to immediate arbitration over its decision to reduce the workforce, as already requested by the Union, and an order enjoining the Defendant from reducing the workforce below the level necessary to safely staff the plant unless and until such time as an arbitration panel decides that such reductions do not violate the collective bargaining agreement.

## II.  STATEMENT OF FACTS

Local 369 represents the employees of Defendant Exelon Service Company. Exelon Generation Company owns Mystic Units 4, 5, 6, & 7 ("Mystic 4-7"). Defendant Exelon Service Company is responsible for maintaining and operating the power generating plants at Mystic 4-7. Exelon has been the principal owner of the power plants since November, 2002.

In addition to the older generating stations ("Mystic 4-7"), Exelon also became obligated on construction loans for newly built power plants known as Mystic 8-9 and Fore River. Verified Complaint at ¶10. In July of 2003 Exelon defaulted on the construction loans. Verified Complaint at ¶13. The default gave the lenders the right to sell Mystic 4-7, as these older units had been pledged as collateral for the construction loans. Verified Complaint at ¶10. To date the assets have not been sold and Exelon Service Company has continued to operate Mystic 4-7.

On December 15, 2003, Exelon Generation Company retired Mystic Units 4, 5, & 6. Prior to the retirement, Exelon Service Company staffed Mystic Units 4, 5, & 6, with **thirteen** licensed operators. As a result of the retirement of Mystic 4, 5, & 6, Defendant Exelon Service Company notified Local 369 that it planned to drastically reduce the workforce at Mystic 4-7 by **forty** employees, including **twenty** operators, on February 13, 2004.

The Local 369 employees impacted by this reduction include operators, engineers, mechanics, electricians, and clerks. Operators, licensed by the Massachusetts Department of Public Safety, assure the safe operation the power plant twenty-four hours a day, seven days a week. They vigilantly monitor equipment and patrol perimeter of the plant. While patrolling the perimeter of the plant, they are responsible for assuring that the 10,250,000 gallons of #6 Fuel Oil Storage, 50,000 gallons of #2 Fuel Oil Storage, 6 hydrogen storage tanks, and other fuel sources on the premises are safe and stable. Mechanics are responsible for making routine and other repairs to keep the thirty-year old plant running safely. Chemical Control Operators are responsible for assuring that the steam produced by the plant is pure and free from contaminants.

Local 369 employees keep the Mystic power plant running safely and reliably. Unless enjoined, Exelon Service Company's staffing cuts will dramatically impact every job classification and threaten the continued safe operation of the power plant. Further, this reduction in staff violates the collective bargaining agreement between Local 369 and Exelon Service Company. A copy of the collective bargaining agreement is attached to the Verified Complaint as Exhibit A.

Article XVI, of the collective bargaining agreement provides:

> No employee in the bargaining unit with five or more years of continuous service who desires continuing employment with the Company will be laid off for lack of

work unless any of the units covered by this Agreement are deactivated, or the operations of any such units are suspended for an extended period of time of substantially curtailed;

Article IV, of the collective bargaining agreement provides:

> The Company recognizes an obligation to promote good employee relations by maintaining rates of pay, wages, hours of employment and other conditions of employment that are equitable, reasonable, and fair;

Article V, of the collection bargaining agreement provides:

> If the Local claims that the Company has exercised the right the right to suspend, discipline, demote or discharge employees in an unjust or unreasonable manner, such claim shall be subject to the Grievance Procedure in Article XXVIII and Arbitration under Article XXIX.

Article XXI, of the collective bargaining agreement provides:

> It is the policy of the Company to have its ordinary maintenance and repair work and such construction work, as is now the present practice, performed by its own employees except in cases of emergency, necessity or temporary peaks of work … It is not the intention of the Company that the use of the services of outside contractors shall result in the layoff, demotion or reduction of pay of its regular employees.

The staffing cuts that the company intends to implement are inequitable, unjust and unreasonable in violation of Article IV as well as a threat to the safety of the remaining workforce. The Company cannot safely maintain operations with the roster that will remain unless it supplements the workforce with contractors, another violation of the collective bargaining agreement. The Local and the Company have bargained to impasse over this issue. The Local and its members have protested the Company's reduction in force as a violation of the collective bargaining agreement, see grievances, <u>Verified Complaint</u>, Ex. C and as a violation of the Occupational Safety and Health Act, <u>Verified Complaint</u>, Ex. B.

### III. ARGUMENT

Pursuant to Section 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a), the district court has jurisdiction to issue a preliminary injunction and/or order the parties to arbitrate under the terms of a collective bargaining agreement. Section 301(a) provides:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this Chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

The grant of a preliminary injunction is addressed to the sound discretion of the court, LeBeau v. Spirito, 703 F.2d 639, 642 (1st Cir. 1983), albeit subject to the constrictive provisions of the Norris-LaGuardia Act, 29 U.S.C. §§ 101 *et seq.*[1] *See* Independent Oil and Chemical Workers of Quincy v. Proctor & Gamble Manufacturing Co., 864 F.2d 927 (1st Cir. 1988). Generally, the anti-injunction strictures of the Norris-LaGuardia Act seek to limit the federal courts' intrusion into the foray of labor disputes, which are best left to the collective bargaining process. Independent Oil and Chemical Workers, 846 F.2d at 929. "Such caution is abundantly justified by the long, sometimes tragic, history of premature judicial intervention in labor-management controversies." Id.

The courts also recognize an exception to Norris-LaGuardia, whereby a district court may issue an injunction "where the collective bargaining agreement contains mandatory arbitration procedures." Educational and Recreational Services, Inc. v. United Steelworkers of America, AFL-CIO, Local 8751, 1980 WL 2165, *3 (D.Mass. 1980). As such, the court may intervene, but only when necessary "to preserve the mechanisms of peaceful arbitration." Independent Oil and Chemical Workers, 846 F.2d at 929 (citing Boys Markets, Inc. v. Retail Clerks Union, Local

---

[1] The Norris-LaGuardia Act provides in part: "No court . . . shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in a strict conformity with the provisions of this chapter . . ."

5

770, 398 U.S. 235 (1970)). This exception to the Norris-LaGuardia Act's prohibitions against injunctions is known as the <u>Boys Markets</u> injunction. In <u>Boys Markets</u>, *supra*, the Supreme Court ruled that a district court could enjoin a strike that was in contravention to a "no-strike" clause, where the strike concerned a grievance that was arbitrable under the collective bargaining agreement. <u>Id.</u> The Supreme Court's reasoning in allowing injunctions in such circumstances was based, in part, on two theories. First, the Court recognized the importance of arbitration "as an instrument of federal policy for resolving [labor] disputes." 398 U.S. at 243. Second, the Court reaffirmed the no strike clause as a quid pro quo for an employer's agreement to submit disputes to arbitration "coupled with the realization that if the no-strike clause were not enforceable, there would be little incentive . . . to agree to arbitration." <u>United Steelworkers, AFL-CIO</u>, 530 F.2d 266, 274 (3d Cir. 1976) (citing <u>Boys Markets</u>, 398 U.S. at 247-248)).

Significantly, while in <u>Boys Markets</u> the injunction issued against a union to enjoin a labor strike, the federal courts have the equal power to restrain employer actions when necessary to preserve the arbitral process. <u>Independent Oil and Chemical Workers</u>, 864 F.2d at 929, n. 2 ("injunctive decrees may issue against unions (as in <u>Boys Markets</u>) and against employers... known as reverse <u>Boys Markets</u> injunctions"). In <u>Independent Oil and Chemical Workers</u>, the First Circuit also rejected as "lopsided", a view of arbitration clauses whereby a court issues injunctions against unions to prevent strikes but issues them against employers to preserve the status quo pending arbitration only in those limited situations where the employer has contracted to preserve the status quo. *See id.* at 931 (rejecting approach in <u>Amalgamated Transit Union, 1384 v. Greyhound Lines, Inc.</u>, 550 F.2d 1237 (9th Cir. 1977)). "Under such a view, an arbitration clause implicitly binds the union not to strike, but does not implicitly bind the

6

employer to preserve the status quo." Id.[2]

"While we recognize that every dispute between labor and management contains the seeds of human discord, courts should intervene only when necessary to preserve the mechanisms of peaceful arbitration or when circumstances of imminent, irremediable harm threaten." Independent Oil and Chemical Workers of Quincy, Inc. v. Procter & Gamble Mfg. Co. 864 F.2d 927, 929 (1 Cir. 1988). Here the standard has been met.

The district court may grant an injunction if it finds that: (1) the grievance is arbitrable (2) the injunction is necessary to preserve the arbitration or prevent imminent harm, and (3) irreparable harm and imbalanced hardships will result if the injunction is denied. International Brotherhood of Teamsters, Local 251 v. Almac's Inc., 894 F.2d 464, 465 (1st Cir. 1990).[3] Application of these factors to the instant facts establishes that temporary relief is warranted against Exelon.

Local 369 does not contend that the Company may not reduce its force. Nor does Local 369 contend that the Company is required to maintain the status quo pending arbitration in this case. The parties specifically negotiated that the Company has the right to reduce the force in response to the decommissioning of Units such as Mystic 4-6. Local 369 has filed grievances challenging the level of layoffs and does not ask the Court to prejudge the outcome of those grievances. The Local request for relief is narrowly drawn. The local requests only that the Company be directed to maintain staffing levels that are necessary for the safe operation of the facility.

---

[2] Even if the more restrictive view of the Ninth Circuit governed this case, the express provisions of Article IV commit the Company to "maintaining . . . hours of employment and other conditions of employment that are equitable, reasonable and fair". At a minimum, such an undertaking requires the Company to maintain staffing at a minimally safe level, regardless of what the lender may instruct.

[3] The factors considered in more general requests for injunctive relief are 1.) likelihood of success on the merits; 2.) potential for irreparable harm if no injunction issues; 3.) balance of hardships; and 4.) the likely effect on public interest. In the context of a Boys Markets request, however, "arbitrability replaces the fourth factor entirely, and tends to preempt the first." Independent Oil and Chemical Workers, 894 F.2d at 930 n. 3.

7

Historically, prior to 1997, power plants were regulated utilities. Statutory and regulatory law ensured that plants were adequately staffed, safely maintained, and responsibly managed. Deregulation has made power plants commodities to be bought and sold and foreclosed upon by energy companies and financial institutions. No statutory or regulatory framework exists to ensure the people who work in power plants, and the communities in which they are located, that these plants will operate safely.

The workers do not have an adequate legal remedy. If this court does not restrain the Company from making these drastic cuts, the safety of the remaining workers at Mystic 7 will be compromised while the grievance and arbitration procedure moves forward.

1. **The Grievances Against Exelon Service Company Are Arbitrable**

There is no dispute that Local 369 and Exelon Service Company have a collective bargaining agreement currently in effect through September 30, 2005. *See* Verified Complaint, Exhibit A. Similarly there is no dispute that the Local has the right to have an arbitrator hear and determine the merits of its grievances.

2. **An Injunction Is Necessary To Preserve Arbitration and Prevent imminent harm**

An injunction is warranted in this case both to preserve the parties' agreement to arbitrate disputes involving staff reductions and to prevent the potential harm of an undermanned power plant. Unions that strike during the term of a collective bargaining agreement over an arbitrable grievance may be enjoined. Boy's Markets v. Retail Clerks, Local 770, 398 U.S. 235 (1970). Here, Local 369 has agreed not to strike, Verified Complaint, Ex. A, Article VI, p.8, and Exelon has agreed to arbitrate grievances, Id, Article XXIX. So far then, this dispute seems on point with Judge McNaught's refusal to grant relief in the Independent Oil case. See IOCW v. Procter &Gamble, No. 88-2048-Mc, 1988 WL 105625 (D. Mass. 1988) *aff'd* 864 F.2d 927.

The difference here is that Exelon agreed to maintain "equitable, reasonable and fair" conditions of employment. It has also agreed not to layoff employees with five or more years of service unless necessitated by a decommissioning. These obligations permit a court to examine whether a reduction in force of the magnitude Exelon seeks to impose will render arbitration meaningless and/or will present such safety dangers as to create an imminent danger. See generally 29 U.S.C. § 143 (recognizing exception for "abnormally dangerous conditions").

Denying an injunction in this case undermines the established federal policy favoring arbitration as the preferred way to settle labor disputes. The Boys Markets injunction was created as an exception to Norris-LaGuardia, to allow the courts to step in to compel parties to arbitrate, such as in needed here, when to do otherwise would undermine that federal policy. In the words of Justice Selya, "Therein lies the rub: in order to preserve the framework of collective bargaining, parties are sometimes thrown back to the courts." Independent Oil, 864 F.2d at 930.

Injunctions should issue in order to preserve a "status of neutrality" so the parties can arbitrate the underlying dispute. Id. at 931 (quoting Lever Brothers Co. v. Int'l Chemical Workers Union, Local 217, 554 F.2d 115, 122 (4th Cir. 1976). Put another way, the injunction is necessary where arbitration would be no more than a "hollow formality" if the status quo is not preserved. Lever Bros., 554 F.2d at 123. In situations such as the instant one, "the injunction preserve[s] the status quo in order to save the arbitration clause." Id. at 119.[4]

### 3. Irreparable Harm and Imbalanced Hardships Will Result if the Injunction is Denied.

In labor cases, the question of irreparable harm turns on whether the arbitration would become meaningless without the injunction. *See* Teamsters, Local 251, 894 F.2d at 465.

---

[4] Plaintiff wished to be clear that it is not seeking to maintain the current workforce. The decommissioning of Mystic 4-6 will result in a layoff. The status quo the Union seeks to maintain is only a minimally safe staffing level.

9

Independent Oil and Chemical Workers, 864 F.2d at 930 (holding that if matter is arbitrable, court may issue injunction where the "actions taken or threatened by one of the parties would render the outcome of any arbitration which might follow meaningless").

Here, the Company will take its action on Friday the 13th without regard to the rights of the employees who will be laid off, most of whom have more than five years of continuous service, the employees who will remain working and the Union's right to have the matter determined by an arbitrator. In rejecting injunction policies by courts that do not require employers to preserve the status quo, and that therefore too heavily favor employers, the First Circuit recognized the "delicate balance" that exists between labor and management, and held that the asymmetry of such a policy contravenes that balance, a balance that "Congress sought to forge and which the Court elaborated in Boys Markets." 864 F.2d at 931. The Court also noted that "the underlying rationale of labor peace, facilitated by an arbitral process equally preservable by either party," is best achieved when courts use their injunctive powers "symmetrically," while also following the cautions contained in the Norris-LaGuardia Act. Id.

In Lever Brothers, *supra*, the decision "embraced" by the First Circuit as articulating "traditional equitable standards" for issuing injunctions against both unions and employers, the Fourth Circuit upheld a district court's decision to enjoin an employer. See id. The court held the injunction "simply preserved a status of neutrality so the parties could arbitrate the underlying differences between them as to the interpretation of the collective bargaining agreement." Lever Brothers, 554 F.2d at 122. That is all the Union is requesting this Court to do here: "preserve a minimally safe status quo pending the completion of arbitration." Id.

The Fourth Circuit recognized that had the district court instead allowed Lever Brothers to take action as it had planned, thus presenting the union with a *fait accompli* prior to the

10

arbitration hearing, the union's task would have been doubly difficult—even if it prevailed at arbitration. Id. The same is true here. Permitting the Company to decimate the workforce and expose the remaining workers to either work such long hours that their abilities become impaired or, alternatively, operate a power plant with fewer operators than necessary prior to an arbitrator determining that such action violates the fundamental undertaking of the collective bargaining agreement renders the arbitral process meaningless. No remedy of any arbitrator will be able to remove the workers from "harm's way" who were required to operate the plant prior to the arbitrator's award. Independent Oil and Chemical Workers 864 F.2d 927, 930 (1 Cir. 1988)("notwithstanding the deference normally due to the arbitration agreement, a dispute-resolution mechanism which would be unable to repair the damage done by a party's unilateral actions would be useless").

Finally, balancing the hardships likely to ensue from the issuance or non-issuance of an injunction favors the position of the Union. Restraining the Company from cutting below a minimally safe manning level works no injustice and serves no extraneous purpose. The Union will obtain only the minimal relief to which equity demands.

## IV.    CONCLUSION

Federal law favors enforcement of arbitration agreements and the maintenance of the status quo pending resolution of disputes. Federal courts have jurisdiction to preserve the status quo in aid of the arbitral process and in aid of employee safety. Plaintiff's motion should be allowed.

Respectfully submitted,
**UTILITY WORKERS, LOCAL 369**
By their attorneys,

_/s/ Paul F. Kelly_

Paul F. Kelly, Esquire
BBO #267000
**SEGAL, ROITMAN & COLEMAN**
11 Beacon Street
Suite #500
Boston, MA  02108
(617) 742-0208

_/s/ Liam Paul Deeney_

Liam Paul Deeney
BBO #648145
Utility Workers' Union of America
Local 369
120 Bay State Drive
Braintree, MA 02184

Dated:  February 12, 2004

12