UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UTILITY WORKERS, LOCAL 369,
        Plaintiff,

v.

EXELON NEW ENGLAND POWER
SERVICES, INC.,
        Defendant.

C.A. No. 04-CV-10293 DPW

## AFFIDAVIT OF BRUCE SMITH IN SUPPORT OF DEFENDANT'S OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING ORDER

I, Bruce Smith, being of legal age, do hereby depose upon my oath and state:

1.     I have personal knowledge of the facts set forth in this Affidavit.

2.     I am employed by Exelon New England Power Services, Inc. (the "Company") as General Manager. I have worked for the Company since 2003.

3.     From April 2003 through September 2003, I served as General Manager of Mystic Generating Station Units 4, 5, 6 and 7 ("Mystic 4-7"). In that capacity, I was responsible for overseeing the staffing and operation of Mystic 4-7. I was also the general manager of Exelon's New Boston plant. I am presently the General Manager of Mystic Units 8 and 9.

4.     Before joining the Company, I worked for Pacific Gas and Electric, National Energy Group as Director of Operations. In that capacity I was responsible for the management of twelve fossil fuel plants and several hydroelectric power plants in various locations throughout the country. In this position, I was responsible for ensuring the safe and efficient operation of the facilities, including the determination of appropriate staffing levels.

**The Retirement of Mystic 4, 5 and 6**

5.  The retirement of Mystic Units 4, 5 and 6 coincides with the completion of new generation stations, Mystic Units 8 and 9, and Fore River, all of which are state-of-the-art combined cycle gas turbines. As a result, the greater Boston area will have the benefit of efficient, clean electricity generation. The older units at Mystic 4-7, specifically, Mystic 4, 5 and 6, are no longer economically viable. Indeed, they have been targeted by environmentalists as shutdown candidates because of substantial particulate emissions over the years. In addition, these older units were restricted to just 30 full operating days per year under Mystic Station's air permit. Further, after Exelon acquired Mystic 4-7 in 2002, the company concluded that the staffing at Mystic 4-7 exceeded the level necessary to operate the plant safely and efficiently.

6.  In New England, electric power generation is overseen by the New England Independent System Operator ("NE-ISO"). In 2003, an application was submitted to NE-ISO requesting permission to retire, or decommission, Mystic 4, 5 and 6. In December 2003, NE-ISO granted Exelon permission to retire Mystic 4, 5 and 6.

**The Company Met with the Union Concerning the Effects of the Retirement of Mystic 4-6**

7.  On December 5, 2003, in accordance with the collective bargaining agreement ("CBA") between the parties, the Company sent a letter to the Utility Workers Union of America, Local 369 (the "Union" or "Local 369"), informing the Union that members of the bargaining unit would be laid off in 60 days (*i.e.*, by February 3, 2004) as a result of the retirement of Mystic 4, 5 and 6.

8.  Shortly thereafter, the parties began a series of meetings concerning the impact of the retirement of Mystic 4, 5 and 6 on the members of the Union's bargaining unit. I was one of the participants representing the Company in these bargaining sessions.

9. On December 30, 2003, the Company informed the Union, both orally and in writing, that it was planning to eliminate around forty-five positions in the bargaining unit due to the retirement of Mystic 4, 5 and 6. The written notice specified that thirty-nine of the positions would be eliminated on February 13, 2004, and that the remaining positions would be eliminated eight to twelve weeks later. A true and accurate copy of the written notice of the anticipated layoffs provided to the Union on December 30, 2003, is attached hereto as Exhibit A. After careful consideration, the Company ultimately decided to eliminate forty-two positions as a result of the permanent retirement of Mystic 4, 5 and 6.

**Staffing at Mystic 7 Will Be Sufficient to Ensure the Safe Operation of the Facility**

10. The Company made its decision about the appropriate level of staffing at Mystic 7, the sole active unit remaining in the Mystic 4-7 plant, after taking into consideration the company's own experience in operating other plants with similar capacity and fuel sources. The Exelon fleet has substantial experience in power generation and operates numerous fossil fuel and hydroelectric power generating units in the Midwest states, mid-Atlantic states, Texas, and New England.

11. In making a decision about the appropriate level of staffing at Mystic 7, in addition to considering the experience of the Exelon fleet of generators, the Company also took into consideration information concerning the staffing levels at generating facilities similar to Mystic 7 that are operated by other companies in the industry.

12. Paragraphs 26 and 27 of the Verified Complaint allege that after the layoffs, there will be sixteen operators working five shifts per week at Mystic 7, and that the Company can staff only eighty of the eighty-four operator shifts required each week. As a result, some of the operators will be required to work overtime. Throughout my employment with the Company, and during my more than twenty years with other power companies, operators have been

3

required to work overtime and they have been willing to do so when given the opportunity. Based on my experience, I believe that after the layoffs on February 13, 2004, the level of overtime required of operators working on Mystic 7 will be consistent with the level of overtime required prior to the layoffs. Further, management believes that the plant can be safely operated with three operators per shift, which would reduce the need for overtime.

13. The anticipated overtime at Mystic 7 is not, in my view, likely to compromise the safety of the plant. The Company's safety record in the Boston area has been better than the industry average.

14. To help maintain a safe environment at Mystic Station, the Company engages a security contractor to provide services aimed at preventing unauthorized persons from entering the Company's facility. Since September 11, 2001, the level of staffing has been adjusted in accordance with threat levels determined by the Department of Homeland Security. The layoffs implemented on February 13, 2004, will not include any reduction in the staffing levels provided by the companies with whom Exelon has contracted to provide security at Mystic Station.

15. Based upon my experience in managing fossil fuel power generating facilities, the Company's experience in staffing other similar fossil fuel power generating facilities, industry data concerning the appropriate staffing levels at plants similar to Mystic 7, the anticipated level of overtime that will be required of operators, and the absence of any change in the staffing provided by security contractors assigned to Mystic Station, I believe that the number of employees who will remain at Mystic 7 following the layoffs implemented on February 13, 2004, will be sufficient to operate that facility safely and efficiently.

16. The layoffs at Mystic 4, 5 and 6, will not affect the staffing levels at any of the Company's other power generating facilities. Only the staffing level at Mystic 4-7 will be reduced by the layoffs on February 13, 2004.

### Shortly after the Union's Members Rejected a Proposed Severance Package at the End of Last Week, the Union Filed Several Grievance Concerning the Mystic Station Layoffs

17.     The Company has had numerous meetings with Local 369 concerning the impact that the retirement of Mystic Units 4, 5 and 6 will have on bargaining unit members. Following these discussions, a severance package was offered to the Union. The proposal included severance payments to employees who were to be laid off. On February 6, 2004, the Union's membership voted to reject the severance package.

18.     On February 10, 2004, the Union informed the Company that it planned to file grievances concerning the anticipated levels of staffing at Mystic 7 following the layoffs. As of this morning, the parties have not yet had the opportunity to complete the resolution process triggered by the February 10 grievances that are attached to the Verified Complaint. Under Article XXVIII of the CBA, the parties must participate in an informal three-step process before a grievance is resolved through arbitration. At no time has the Company refused to meet with the Union on the grievances. At no time has the Company refused to arbitrate the grievances.

Sworn under the penalties of perjury this 13th day of February, 2004.

_Bruce Smith_     2/13/04